**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DORIS AMANDA RODRIGUEZ-ZUNIGA; NELSON GABRIEL TOBAR-RODRIGUEZ, *Petitioners*, | No. 19-72024 Agency Nos. A209-217-710 A209-217-711 |
| v. | |
| MERRICK B. GARLAND, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted October 20, 2022
San Francisco, California

Filed June 7, 2023

Before: Ronald Lee Gilman,[*] Consuelo M. Callahan, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge VanDyke;
Dissent by Judge Gilman

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Immigration

The panel denied Doris Amanda Rodriguez-Zuniga's and her son Nelson Gabriel Tobar-Rodriguez's petition for review of the Board of Immigration Appeals' dismissal of their appeal of an immigration judge's denial of asylum and related relief.

Rodriguez-Zuniga testified that she was afraid to return to Guatemala because a woman had attempted to rob her after she withdrew money from a bank. The woman told Rodriguez-Zuniga that she targeted her because Rodriguez-Zuniga had family in the United States and a lot of money. The woman also threatened that Rodriguez-Zuniga's son would "pay for it" due to Rodriguez-Zuniga's refusal to give her the money. Rodriguez-Zuniga and her son asserted that she had suffered past persecution and had a well-founded fear of future persecution on account of her political opinion of refusing to submit to violence by criminal groups or gangs, and their claimed membership in three particular social groups: "Guatemalan families that lack an immediate family male protector," "Guatemalan women," and "immediate family members of Doris Amanda Rodriguez-Zuniga."

Because the record did not compel the conclusion that Guatemalan society perceived it as a distinct group, the panel held that Rodriguez-Zuniga failed to show that the agency erred in concluding that her proposed social group

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

comprised of "Guatemalan families that lack an immediate family male protector" was not cognizable. The panel also concluded that substantial evidence supported the agency's determination that Rodriguez-Zuniga had not expressed a political opinion. The panel explained that Rodriguez-Zuniga's refusal to give money to the threatening robber was not evidence of a "conscious and deliberate" decision that would naturally result in attributing a political position to her, and that she instead simply reacted to being robbed. Absent some evidence that Rodriguez-Zuniga expressed a political opinion beyond merely her resistance to being robbed, the panel concluded that the agency did not err in determining that she failed to establish nexus to a political opinion.

Turning to Rodriguez-Zuniga's family social group claim, the panel concluded that the murder of Rodriguez-Zuniga's cousin and her cousin's son because they refused to pay the gangs did not compel any conclusion about the robber's motivation in Rodriguez-Zuniga's case. The panel further concluded that Rodriguez-Zuniga failed to establish a nexus to her family membership based on the robber's threats to her son to get her to pay money. The panel wrote that to establish a nexus between her family membership and her harm, Rodriguez-Zuniga had to show that her family membership was a reason motivating the robber to target her. The panel explained that where the record indicates that the persecutor's actual motivation for threatening a person is to extort money from a third person, the record does not compel finding that the persecutor threatened the target because of a protected characteristic such as family relation.

Even assuming for the sake of argument that the harm against Rodriguez-Zuniga's son could support her own asylum claim, the panel held that Rodriguez-Zuniga failed to

make the required showing of nexus. The panel explained that substantial evidence supported the agency's finding that the robber threatened Rodriguez-Zuniga's son only as an instrumental means to obtain money, and that the robber was not motivated intrinsically by the son's familial relationship to Rodriguez-Zuniga. Rather, the robber targeted the son for the same reason she would target, for example, the petitioner's life-long friend if the opportunity arose—merely because she thought Rodriguez-Zuniga cared about that person and thus the robber could use threats against that person as a means of obtaining money from Rodriguez-Zuniga. The panel explained that the extorted person's motivation to give the money because they care for their family member does not transform the persecutor's motivation from money to actual animus against a protected characteristic.

The panel also rejected Rodriguez-Zuniga's "extortion-plus" claim under *Ayala v. Sessions*, 855 F.3d 1012 (9th Cir. 2017). The panel explained that "extortion-plus" is simply the recognition that a persecutor can hold multiple motives for harming someone. However, unlike in *Ayala*, in this case the agency made no erroneous legal conclusion that extortion could not constitute persecution regardless of other motives. Instead, the agency expressly concluded there were no other such motives.

The panel held that the remainder of Rodriguez-Zuniga's evidence from country conditions reports did not compel the conclusion that Rodriguez-Zuniga established an objectively reasonable fear of future persecution. While recognizing that there is no categorical rule that the failure to establish a nexus for past persecution forecloses nexus for future persecution, the panel did not read the IJ's decision as necessarily applying such a categorical rule. The panel

wrote that even if the IJ erred in applying some categorial rule, the BIA did not, and instead addressed them as two independent inquiries.

Finally, the panel concluded that by failing to adequately address the issue in her opening brief, Rodriguez-Zuniga had forfeited any argument that the agency incorrectly found she would not suffer torture with the consent or acquiescence of the government. Because a petitioner can state a claim for CAT relief only if she shows that the government would acquiesce in her torture, the panel concluded that Rodriguez-Zuniga's failure to contest this point was fatal to her claim.

Dissenting, Judge Gilman disagreed with the majority's conclusion that petitioners failed to establish nexus based on their family membership. Because Nelson's would-be persecutors were interested in him only because of his relationship to his mother, in Judge Gilman's view, he satisfied both the "a reason" nexus standard for withholding of removal and the "one central reason" nexus standard for asylum.

Judge Gilman also wrote that the majority's nexus holding with respect to Rodriguez-Zuniga conflicted with this court's decision in *Ayala*. Judge Gilman wrote that nowhere in *Ayala* does the court suggest that a showing of "animus" on the part of the persecutor is necessary. Judge Gilman also explained that, unlike in *Ayala,* in this case there was no ambiguity as to why Rodriguez-Zuniga was targeted. Rodriguez Zuniga's potential persecutors knew her identity and the identities of her family members, and their representative targeted Rodriguez-Zuniga using her relationship to her son and because of her relationship to her husband. Additionally, Judge Gilman wrote that by eliminating a petitioner's ability to establish a nexus to a

protected ground where the persecutor's actual motivation for threatening a person is to extort money from a third person, the majority departs from this court's precedents that affirm the principle that people, including persecutors, often have mixed motives.

Judge Gilman wrote that the majority also failed to hold the agency accountable for several procedural missteps, including the agency's failure to independently analyze the likelihood that petitioners would be subjected to future harm, failure to properly consider Rodriguez-Zuniga's political opinion claim, failure to consider all evidence relevant to the possibility of future torture, including based on her gender, and the agency's application of too narrow a government acquiescence standard. Judge Gilman also disagreed that petitioners had forfeited the government acquiescence issue.

## COUNSEL

Roger Sismaet Green (argued) and Jenny Tsai, Green & Tsai, San Francisco, California, for Petitioners.

Timothy B. Stanton (argued) and Kristen H. Blosser, Trial Attorneys; Sabatino F. Leo, Senior Litigation Counsel; Joseph H. Hunt, Assistant Attorney General, Civil Division; Office of Immigration Litigation, United States Department of Justice; Washington, D.C.; for Respondent.

**OPINION**

VANDYKE, Circuit Judge:

Doris Amanda Rodriguez-Zuniga petitions for review of the decision of the Board of Immigration Appeals (BIA) dismissing her appeal from the removal order of the Immigration Judge (IJ). The heart of Rodriguez-Zuniga's petition is her fear that, because she experienced an attempted robbery in her native country, she will be subject to persecution in the future. But fear of generalized crime is not a sufficient basis for asylum or withholding of removal, nor do her other arguments show that she is entitled to relief. We have jurisdiction under 8 U.S.C. § 1252 and deny her petition.

## I. BACKGROUND

In June 2016, Rodriguez-Zuniga and her son, Nelson Gabriel Tobar-Rodriguez, entered the United States without valid entry documents. They are both citizens and natives of Guatemala. Soon after, the United States initiated removal proceedings against Rodriguez-Zuniga. She was charged with being an "immigrant who, at the time of application for admission, [was] not in possession of a … valid entry document."

Rodriguez-Zuniga conceded both the allegations against her and removability, but applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). She claimed that she was entitled to asylum because she "suffered past persecution and ha[d] a well-founded fear of future persecution based upon her political opinion and membership in a particular social group." Her purported political opinion was her "refusal to submit to

violence by criminal groups/gangs."   She claimed to be a member of three particular social groups: "Guatemalan families that lack an immediate family male protector," "Guatemalan women," and "immediate family members of Doris Amanda Rodriguez-Zuniga."  She alleged she suffered past persecution generally because of the "bad state of gang affairs" in Guatemala and, more specifically, because a woman had attempted to rob her.

Rodriguez-Zuniga also argued that she had a well-founded fear of future persecution because of her past persecution, the murder of her cousin and her cousin's child, and the generally "precarious current state of Guatemala." Rodriguez-Zuniga finally claimed that she was entitled to withholding of removal and CAT relief for the same reasons she was entitled to asylum.

At her hearing before the IJ, Rodriguez-Zuniga testified that she was afraid to return to Guatemala because a woman had attempted to rob her when she lived there.  In March 2016, just a few months before she entered the United States, Rodriguez-Zuniga had gone to the bank to withdraw $150, money that her husband in the United States "had sent [her]." At that time, Rodriguez-Zuniga regularly received money from her husband.  As she exited the bank, a woman threatened Rodriguez-Zuniga if she did not give her the money.  Rodriguez-Zuniga believed the woman "belonged to a group of … gangs or a group who harms people."  The woman told Rodriguez-Zuniga that if she did not give her the money, she was going to hurt Rodriguez-Zuniga or her son.  Rodriguez-Zuniga refused, and the woman told her that Rodriguez-Zuniga's "son was going to pay for it and that she was going to come and find [Rodriguez-Zuniga] again."  The woman told Rodriguez-Zuniga that she targeted her because Rodriguez-Zuniga's "family was [in the United States] and

[because she] had a lot of money that [she] could give them." Rodriguez-Zuniga never saw the woman again.

Rodriguez-Zuniga also told the IJ about her female cousin who had been killed by gangs when "she refused to give them money." Her cousin's son was also killed, but Rodriguez-Zuniga did not know whether it "was the gang members that killed him."

The IJ found that Rodriguez-Zuniga "testified credibly and accord[ed] her testimony full evidentiary weight," but denied relief. As for asylum and withholding, the IJ found that Rodriguez-Zuniga's past harms and fear of future harms lacked the requisite nexus to her statutorily protected grounds. The IJ rejected Rodriguez-Zuniga's proposed particular social group of "Guatemalan families that lack an immediate family male protector." The IJ found that Rodriguez-Zuniga's family was a particular social group because "family relationships are generally 'easily recognizable and understood by others to constitute social groups.'" The IJ also found that Guatemalan women were a particular social group because of the "high level of violence committed against Guatemalan women" and their "need [for] specialized protection" indicated they are viewed as a distinct group as compared to the general population in Guatemala. But the IJ found no nexus between the harm Rodriguez-Zuniga suffered and her membership in either cognizable particular social group, observing that the female robber "did not mention [Rodriguez-Zuniga's] gender or her lack of a 'male protector' in the family; rather, the perpetrator seemed to only want money." And because she presented no additional evidence for her feared future persecution beyond her nexus evidence for her past persecution, the IJ found that Rodriguez-Zuniga likewise lacked a nexus for her feared future harm. Finally, the IJ

denied Rodriguez-Zuniga's claim for CAT relief because she did not establish that it was "more likely than not she will be tortured by or with the acquiescence of the government if [she] returned to Guatemala."

Rodriguez-Zuniga appealed to the BIA, and the BIA dismissed her appeal. It first "adopt[ed] and affirm[ed] the decision of the Immigration Judge for the reasons stated [in the IJ's opinion]" before explaining the its own additional reasons for dismissing the appeal. As for asylum and withholding, the BIA agreed that one of Rodriguez-Zuniga's proposed social groups was not cognizable and that she failed to establish a nexus between her past harm or feared future harm and "either her family membership[] or her status as a Guatemalan woman." The BIA rejected Rodriguez-Zuniga's claim that she was persecuted because of her political opinion, concluding that "there [was] no evidence she ever expressed a political opinion." It also rejected her CAT claim because Rodriguez-Zuniga did not show that she was sufficiently likely to suffer torture with the consent of the government.

## II.     STANDARD OF REVIEW

"Where, as here, the BIA agrees with the IJ's reasoning, we review both decisions." *See Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1293 (9th Cir. 2018). We review the agency's decision under the highly deferential substantial evidence standard. *Ruiz-Colmenares v. Garland*, 25 F.4th 742, 748 (9th Cir. 2022). Under that standard, the agency's findings of fact are considered "conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." *Id.* We review questions of law de novo. *Id.*

## III.  DISCUSSION

The agency did not err in denying Rodriguez-Zuniga's asylum and withholding claims.[1]  Her arguments do not show that the agency erred in rejecting one of her proposed particularized social groups or in concluding that she failed to present evidence that she expressed a political opinion. And substantial evidence supports the agency finding of no nexus between Rodriguez-Zuniga's membership in the particularized social groups that the agency accepted as cognizable and any harm she experienced or feared. Substantial evidence also supports the agency's finding that Rodriguez-Zuniga did not establish it was more likely than not that the government would torture her upon her return to Guatemala.  We therefore deny her petition for review.

### a.  The Agency Did Not Err in Denying Rodriguez-Zuniga's Asylum and Withholding of Removal Claims.

For both asylum and withholding claims, a petitioner must prove a causal nexus between one of her statutorily protected characteristics and either her past harm or her objectively tenable fear of future harm.  *See Garcia v. Wilkinson*, 988 F.3d 1136, 1143 (9th Cir. 2021) (asylum); *Flores-Vega v. Barr*, 932 F.3d 878, 886–87 (9th Cir. 2019) (withholding).  These statutorily protected characteristics include "race, religion, nationality, membership in a particular social group, [and] political opinion."  8 U.S.C. § 1158(b)(1)(B)(i)  (asylum);  *see  also*  8  U.S.C. § 1231(b)(3)(A) (withholding).

---

[1] Nelson, Rodriguez-Zuniga's son, is a derivative beneficiary on this petition.

The agency denied asylum and withholding relief because Rodriguez-Zuniga failed to make a showing of nexus for either her past harm or feared future harms. Rodriguez-Zuniga contends that the agency erred in numerous respects: first, by rejecting one of her proposed particular social groups; second, in finding that she never expressed a political opinion; and third, in finding that there was no nexus between Rodriguez-Zuniga's cognizable protected social groups—family membership and "Guatemalan women"—and either her past harms or feared future harms.

### i. Rodriguez-Zuniga does not show that the agency erred in rejecting her proposed particular social group.

The agency concluded that Rodriguez-Zuniga's proposed particular social group of "Guatemalan families that lack an immediate family male protector" was not cognizable because the evidence did not establish that such families "are perceived as a group by society." "The [agency's] conclusion regarding social distinction—whether there is evidence that a specific society recognizes a social group—is a question of fact that we review for substantial evidence." *Conde Quevedo v. Barr*, 947 F.3d 1238, 1242 (9th Cir. 2020). Rodriguez-Zuniga fails to show that the record compels the conclusion that her proposed group is "perceived as a group by society."

Rodriguez-Zuniga contends that the agency failed to recognize that the group it rejected is built upon the foundations of the groups that were previously accepted. Although somewhat unclear, she appears to contend that the same evidence that makes both her family—which lacks an immediate male protector—and "Guatemalan women" socially distinct necessarily renders every family without an

immediate male protector socially distinct.  But the evidence the agency relied on to find these two other groups cognizable—the "easily recognizable" nature of family units and people's general understanding that they "constitute social groups," as well as the recognition of Guatemalan women's need for special protection—doesn't compel the conclusion that families without an "immediate family male protector" are separately perceived as "set apart, or distinct, from other persons within a society." *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1077 (9th Cir. 2020).

The three groups are different, and the agency could reasonably find that the same evidence doesn't render all three groups distinct.  Beyond this failed argument, Rodriguez-Zuniga points to no record *evidence* indicating that "families that lack an immediate family male protector" is perceived as a distinct group.  She thus fails to show that the agency lacked substantial evidence in rejecting her membership in "families that lack an immediate family male protector" or that the record compels a different conclusion.

> ii.    **Substantial evidence supports the agency's conclusion that Rodriguez-Zuniga did not present evidence that she expressed a political opinion.**

Rodriguez-Zuniga claims she was persecuted because of her political opinion, which she frames as her refusal to "submit to violence by criminal groups/gangs."  The agency below rejected her claim, concluding that she presented no evidence "she ever expressed a political opinion." Rodriguez-Zuniga argues that the agency erred because she presented evidence of a political opinion when she testified to the agency regarding her refusal to give the female robber the demanded money.  But because that act was not a

"sufficiently conscious and deliberate" expression of a political opinion, our precedents make clear that it cannot support Rodriguez-Zuniga's claim. *De Valle v. INS*, 901 F.2d 787, 791 (9th Cir. 1990) (citation omitted).

A person's deeds express a political opinion only when they are "'sufficiently conscious and deliberate' decisions or acts" such that society would naturally "attribute[] certain political opinions to [the petitioner]" based on those acts. *Id.* (citation omitted). Rodriguez-Zuniga's refusal to give money to the threatening robber is not evidence of a "conscious and deliberate" decision that would naturally result in attributing a political position to her. *Id.* Rather, she simply reacted to being robbed. If merely resisting a robbery could constitute expressing a political opinion, then every person who avoided being the victim of a crime could seek asylum. But most people who resist criminal activity directed towards them do so for obvious non-political self-interested reasons—they don't want to be the victim of a crime. *See Santos-Lemus v. Mukasey*, 542 F.3d 738, 747 (9th Cir. 2008) (relying on the fact that "opposition to [a] gang's criminal activity" is not necessarily "based on political opinion"), *abrogated on other grounds by Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013). Nor is Rodriguez-Zuniga's mere unwillingness "to cooperate with a potential persecutor … necessarily expressive conduct constituting a political opinion." *Chen v. INS*, 95 F.3d 801, 806 (9th Cir. 1996) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 480–83 (1992)); *see also Regalado-Escobar v. Holder*, 717 F.3d 724, 730 (9th Cir. 2013) (explaining that "fail[ing] to cooperate in [a political party's] recruitment efforts" does not necessarily express "principled opposition to [the political party] or its violence").

Rodriguez-Zuniga presents no other evidence in support of her political opinion argument, nor does she present additional evidence as to any nexus between her purported political opinion and her harm.  Absent some evidence that Rodriguez-Zuniga expressed a political opinion beyond merely her resistance to being robbed, the record does not require the conclusion the agency erred.  *See Garcia-Milian v. Holder*, 755 F.3d 1026, 1032 (9th Cir. 2014) (concluding that the record "does not compel" a different conclusion than the agency's when the petitioner "provided no evidence" on the point).  Substantial evidence thus supports the agency's rejection of Rodriguez-Zuniga's claim for asylum and withholding on the basis of a political opinion.  *See Rodriguez Tornes v. Garland*, 993 F.3d 743, 752 (9th Cir. 2021) (requiring a showing of nexus for both asylum and withholding claims based on political opinion).

### iii.  Substantial evidence supports the agency's finding that Rodriguez-Zuniga's harms lacked a nexus to a protected characteristic.

For both her asylum and withholding claims, Rodriguez-Zuniga must show a nexus between her past harms or feared future harm and her statutorily protected characteristics.  *See Garcia*, 988 F.3d at 1143 (asylum); *Flores-Vega*, 932 F.3d at 887 (withholding).  For asylum, she must provide evidence showing that her protected characteristics were "one central reason" for either her past harms or her feared future harms.  8 U.S.C. § 1158(b)(1)(B)(i).  For withholding, she must provide evidence showing it is more likely than not that her life or freedom will be threatened, consisting in part of evidence indicating that her protected characteristics will be "a reason" for her suffering harm in the future.  *See* 8 U.S.C. § 1231(b)(3)(A); *Garcia*, 988 F.3d at 1146.  The reasons

needed to prove a nexus refer to the persecutor's motivations for persecuting the petitioner. *See id.* "Because a persecutor's actual motive is a matter of fact, we review that finding for substantial evidence." *Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 893 (9th Cir. 2021) (cleaned up).

The agency found Rodriguez-Zuniga had failed to establish any nexus whatsoever between  past harm she suffered and either of her proposed social groups.  Circuit precedent requires a lower nexus showing for withholding of removal than asylum, requiring only "a reason" for withholding of removal as compared to a "central reason" for asylum. *Barajas-Romero v. Lynch*, 846 F.3d 351, 360 (9th Cir. 2017).  So it is possible that a petitioner who failed to show a sufficient nexus for asylum might nonetheless meet the lower nexus requirement for withholding of removal.  But where, as here, the agency concludes that the petitioner has not shown *any* nexus whatsoever, then the petitioner fails to establish past persecution for both asylum and withholding. *See id.* (observing there is "no distinction between the 'one central reason' phrase in the asylum statute and the 'a reason' phrase in the withholding statute … [where] there was *no nexus at all*" (quoting *Zetino v. Holder*, 622 F.3d 1007, 1016 (9th Cir. 2010) (emphasis added)).

The sole harm that Rodriguez-Zuniga contends amounted to past persecution was the female robber's threat against her and her son.  She claims the robber was motivated to make this threat by Rodriguez-Zuniga's membership in two protected groups: Rodriguez-Zuniga's family and "Guatemalan women."  The agency found that the robber was not motivated by her membership in either of those groups, but was instead solely motivated by money.

The agency first found that the woman did not target Rodriguez-Zuniga because of her status as a "Guatemalan woman," noting that the woman "did not mention [Rodriguez-Zuniga's] gender" at all during the attempted robbery. Rodriguez-Zuniga contends this was an error, but the only evidence she references is that "Guatemala ha[s] a notorious record in lacking in Guatemalan female protection." The general vulnerability of women in Guatemala tells us nothing about the female robber's particular motivations, and certainly does not compel the conclusion that the robber threatened Rodriguez-Zuniga because she is a woman. *See Barajas-Romero*, 846 F.3d at 357 (explaining that "the persecutor's motive" is what matters for nexus); *cf. Lalayan v. Garland*, 4 F.4th 822, 840 (9th Cir. 2021) (explaining that while "country reports and news articles" indicate problems in the petitioner's home country, "they in no way establish that [he] would 'more likely than not' be persecuted upon removal … on account of his [protected ground]").

The agency next found that the woman did not threaten Rodriguez-Zuniga's son because of or on account of his kinship to Rodriguez-Zuniga. Instead, she "appeared to be motivated exclusively by monetary interest." Substantial evidence supports the agency's nexus finding because Rodriguez-Zuniga "did not demonstrate that the gang members who sought to extort money from [her] … were motivated by anything other than an economic interest." *Iraheta-Osorio v. Holder*, 445 F. App'x 8, 9 (9th Cir. 2011) (citing *Parussimova v. Mukasey*, 555 F.3d 734, 740 (9th Cir. 2009)).

Rodriguez-Zuniga contends that the agency erred in finding no nexus between the threat and her family membership. She relies on the fact that gangs murdered her

cousin and her cousin's son because they refused to pay the gangs, but this does not compel any conclusion about the robber's motivation in Rodriguez-Zuniga's case. *See Tamang v. Holder*, 598 F.3d 1083, 1094 (9th Cir. 2010) (explaining that "vague threats made against [the petitioner's] family" did not compel the conclusion that the petitioner's "perceived fear of future persecution is … objectively reasonable").

The heart of Rodriguez-Zuniga's argument, instead, is that the woman threatened her son to get her to pay money, which "displays the gangs' specifically targeting … a specific family member to get petitioner to comply." To establish a nexus between her family membership and her harm, Rodriguez-Zuniga must show that her family membership was a reason motivating the robber to target her. *See Barajas-Romero*, 846 F.3d at 357. Where the record indicates that the persecutor's actual motivation for threatening a person is to extort money from a third person, the record does not compel finding that the persecutor threatened the target because of a protected characteristic such as family relation.**[2]** *See Baballah v. Ashcroft*, 367 F.3d

---

[2] The dissent laments our use of the modifier "actual" before motivation, criticizing our failure to recognize that a petitioner may establish asylum or withholding even when the persecutor holds multiple or mixed motivations. We of course agree that a petitioner may be entitled to relief when a persecutor holds multiple or mixed motivations, and one of those motivations is that the persecutor actually wants to harm the petitioner based on her protected characteristic. We do not deny that basic principle in emphasizing that the motivation must be "actual." Instead, the modifier "actual" distinguishes between where a protected characteristic intrinsically motivates the persecutor to harm a victim— for example, because the persecutor has animus towards people who profess a certain religion—and where a protected characteristic is simply

1067, 1075 n.7 (9th Cir. 2004) (explaining that this court's precedent precludes relief when persecution is "solely on account of an economic motive"); *Zetino*, 622 F.3d at 1016 ("An alien's desire to be free from harassment by criminals motivated by theft or random violence by gang members bears no nexus to a protected ground."); *see also Sanchez v. Sessions*, 706 F. App'x 897, 899 (9th Cir. 2017) (rejecting a nexus because threats to the petitioner's family were only a means of obtaining desired information, not "because of the family relationship per se").  In such a situation, the extorted person may be motivated to give the money because they care for their family member, but that doesn't transform the *persecutor's* motivation from money to actual animus against a protected characteristic.

---

an instrumentality for the persecutor to accomplish his goals, such as here, where there is *no* evidence the gang member cared at all that Rodriguez-Zuniga was related to her son or that her son was related to Rodriguez-Zuniga.  The dissent similarly asserts that our distinction would preclude a petitioner from "establish[ing] that family membership is even 'a reason' for any potential persecution where financial gain also motivates the persecutor."  That worry is unfounded.  Our caselaw permits someone to establish a nexus when one of the persecutor's motivations is financial so long as another motivation, either the "central" reason or simply "a reason" depending on what claim is being pressed, is actually motivating the persecutor and is based on a victim's protected characteristic.  *See, e.g., Baghdasaryan v. Holder*, 592 F.3d 1018, 1025–26 (9th Cir. 2010).  It should thus be clear from the foregoing that we are not—contrary to the dissent—saying that a victim persecuted because of "the petitioner's family membership" is prevented from showing a nexus just because the "persecutor's motives *also* contain a financial dimension." (Emphasis added.)  But this case does not present such mixed motives—substantial evidence supports the agency's finding that here financial motivation was not in addition to a motivation based on family membership, but was instead the persecutor's exclusive motivation.

Assuming for the sake of argument that harm against Rodriguez-Zuniga's son could support her own asylum claim, Rodriguez-Zuniga has failed to make the required showing of nexus. Substantial evidence supports the agency's finding that the robber threatened Rodriguez-Zuniga's son only as an instrumental means to obtain money, and was not motivated intrinsically by his familial relationship to his mother. Rodriguez-Zuniga repeatedly testified that the reason the woman targeted her was because she "had a lot of money that [she] could give them." "[I]f [Rodriguez-Zuniga] didn't give her that money[,] she was going to hurt" her or her son. The record in this case thus does not compel the finding that the robber's motivation for threatening to hurt Rodriguez-Zuniga's son was his familial relationship to Rodriguez-Zuniga. Rather, the robber targeted the son for the same reason she would target, say, the petitioner's life-long friend if the opportunity arose— merely because she thought Rodriguez-Zuniga cared about that person and thus the robber could use threats against that person as a means of obtaining money from Rodriguez-Zuniga.[3]

Rodriguez-Zuniga attempts to refute this point by citing *Ayala v. Sessions*, where our court stated that "economic extortion on the basis of a protected characteristic can constitute persecution." 855 F.3d 1012, 1020 (9th Cir. 2017). Rodriguez-Zuniga misreads *Ayala*. Like this case, *Ayala* involved extortion. But as the court explained, it involved an "extortion-plus" claim, that is, a claim that the petitioner was independently targeted, not just for money,

---

[3] We do not suggest one way or another whether the threat to the son could apply to Rodriguez-Zuniga**.** There is no need to reach that issue in this case.

but also *because of* a protected ground. *Id.* at 1021. An "extortion-plus" nexus is simply one instantiation of our precedent's recognition that a persecutor can hold multiple motives for harming someone. *See Parussimova*, 555 F.3d at 739 (citing *Borja v. INS*, 175 F.3d 732 (9th Cir. 1999) (en banc), where our court first recognized an "extortion-plus" motive, as an example of a "mixed-motive case[]"). To that end, the court in *Ayala* held that it was "legal error for the IJ to hold that extortion *could not* constitute persecution for the purposes of withholding[] where the petitioner's membership in a particular social group … is at least 'a reason' for the extortion." *Ayala*, 855 F.3d at 1021.

Our court identified two errors by the agency in *Ayala*: one legal and one factual. The agency's legal error was categorically holding that, if a persecutor is motivated by a financial goal, *i.e.*, to extort, he cannot also be motivated by a petitioner's protected characteristic. *See id.* As *Ayala* recognizes, that is incorrect. Logically, a persecutor who extorts someone could in theory be motivated not just by the prospect of obtaining money but also by a petitioner's protected characteristic. The first error the agency in *Ayala* made was thus holding that a petitioner could never prove a nexus when the persecutor extorted the petitioner. *See id.* But it also bears noting that just because an "extortion-plus" persecution is possible—someone could be motivated to extort a particular person by, say, actual animus towards their family—common sense tells us that will often, indeed usually, not be the case.[4]

---

[4] The dissent quibbles over our example of an "extortion-plus" claim because we use the word "animus." But our court often uses "animus" as an example of the type of "nexus" required for an asylum or

Regardless of the likely infrequency of an "extortion-plus" claim, it remains true that, when required to decide whether the petitioner established a nexus, the agency must determine whether the petitioner showed that a protected characteristic motivated the petitioner's persecutor. *See, e.g.*, *Garcia*, 988 F.3d at 1143–44 (citation omitted) (noting that the petitioner must show that a protected characteristic motivated the persecutor). The agency's second error in *Ayala*, its factual error, was its failure to do just that. Because the agency held that a petitioner "could not" prove a nexus where a persecutor extorts her, the agency necessarily never made a factual finding on whether the petitioner established her persecutor was motivated by anything other than financial ends. *Ayala*, 855 F.3d at 1021; *see Regalado-Escobar*, 717 F.3d at 729–30 (explaining that the BIA's holding that opposition to a political party's use of violence "could not be a political opinion" was an "err[or] as a matter of law" and meant that the agency "did not conduct the necessary factual inquiry as to whether [the petitioner] had a protected political opinion").

Given these two errors, our court remanded the case. But to be clear, even the panel in *Ayala* expressed reservations—reservations the dissent here seems to share—over whether the petitioner would actually succeed before the agency. *See*

---

withholding claim. *See, e.g.*, *Sinha v. Holder*, 564 F.3d 1015, 1022 (9th Cir. 2009) (faulting the IJ "in his nexus analysis" because a reasonable IJ would have found that the attackers "were motivated at least in part by racial animus"); *Garcia*, 988 F.3d at 1145 (noting that, "over time," certain conduct "can demonstrate a kind of animus …. sufficient to demonstrate nexus" (citation omitted)). And ultimately, the dissent's aversion to the word animus does not change our main point—*Ayala* was about two errors, one legal and one factual, and neither error was made by the agency in this case.

*Ayala*, 855 F.3d at 1021 ("*Whatever the merits of her claim*, it was legal error for the IJ to hold that extortion *could not* constitute persecution …." (emphasis added)).  The reason for the court's doubts is obvious from reading *Ayala*: the petitioner there presented barely any evidence, perhaps none at all, that family membership actually motivated her persecutor. *See id.* at 1016–17.  Thus, even if the record in *Ayala* seems unlikely to compel a finding of nexus, the agency's legal error and its failure to find the persecutor's actual motivations required remand in that case.

Ultimately, it is the majority's approach in this case and not the dissent's that is consistent with *Ayala*.  To borrow from the dissent's discussion of the petitioner in *Ayala*, Rodriguez-Zuniga has not "present[ed] the court with factual evidence to support her theoretically valid nexus theory." And unlike in *Ayala*, there was no erroneous legal conclusion by the agency in this case that "extortion *could not* constitute persecution" regardless of other motives—the underlying error the court faulted the agency for in *Ayala*. *Id.* at 1021.  Instead, the agency here expressly concluded there were no other such motives—precisely what our court found missing in *Ayala*.  In short, there is no reason to remand in this case because the agency here didn't make the categorical legal mistake it made in *Ayala*, and it has already made the factual conclusion that was missing in *Ayala*.  And nothing compels the conclusion that the robber in this case was motivated by anything other than underlying economic reasons, even though those economic motivations also resulted in threats to Rodriguez-Zuniga's son. *See Juarez Morales v. Wilkinson*, 836 F. App'x 603, 605 (9th Cir. 2021) (explaining that *Ayala* "is irrelevant …. [where the petitioner] offers no evidence that a protected ground was a reason for [her] extortion").

As for Rodriguez-Zuniga's fear of future harm, the agency again found no nexus. The BIA explained that she "did not establish a nexus between any feared harm and a protected ground." Instead, the BIA noted that her "claim [was] based on a fear of general violence and criminal activity in Guatemala." The record compels no different conclusion. As explained above, the record supports the agency's finding that the attempted robbery bore no nexus to a protected characteristic. The remainder of Rodriguez-Zuniga's evidence is from country conditions reports that do not compel the conclusion that her fear of future persecution was objectively reasonable.

The dissent argues that the agency erred in its analysis of Rodriguez-Zuniga's fear of future harms because the IJ applied an improper categorical rule to reject the claim. The IJ noted that, having found Rodriguez-Zuniga could not "claim past persecution on account of a protected ground, it necessarily follow[ed] she also cannot claim a well-founded fear of future persecution on account of the same ground." The dissent reads the IJ as applying as a categorical rule that every time a petitioner fails to establish a nexus for past persecution, she would necessarily fail to establish a nexus for future persecution. We agree that such a categorical rule would not be supported by our precedent, but we do not read the IJ as necessarily applying such a categorical rule. Instead, the IJ was noting that in this case, because Rodriguez-Zuniga offered evidence going only to her past persecution, the fact that she failed to establish a nexus for past persecution means that the same evidence would not show future persecution.

That's certainly how the BIA read the IJ, and we need not read the decision any differently. The BIA explained that Rodriguez-Zuniga "did not establish a nexus between

the single incident she experienced," *i.e.*, her past harm, "or the harm she fears," *i.e.*, her feared future harm, "and either her family membership, or her status as a Guatemalan woman." If the IJ erred in applying some categorical rule, the BIA did not—it instead addressed them as two independent inquiries. And to the extent the BIA and IJ part ways, we review the BIA's findings for substantial evidence.

In short, substantial evidence supports the agency's finding that Rodriguez-Zuniga's two protected grounds were not "a reason" for her past persecution or feared future persecution, necessarily defeating both her asylum and withholding claims. We therefore deny Rodriguez-Zuniga's petition for review of her asylum and withholding claims.

## b. Substantial Evidence Supports the Agency's Denial of CAT Relief.

"For CAT relief, the alien must prove that it is 'more likely than not that he or she would be tortured if removed to the proposed country.'" *Barajas-Romero*, 846 F.3d at 361. And that "torture must be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Id.* The agency found that Rodriguez-Zuniga had not "demonstrate[d] the government of Guatemala would consent or acquiesce to her torture."

Although she argues that the agency should have granted her CAT relief, Rodriguez-Zuniga does not argue that the agency erred in finding that she presented insufficient evidence that the Guatemalan government would consent to her torture. Indeed, the closest Rodriguez-Zuniga comes to addressing acquiescence is in her background section, when she explains that she did not tell the police about the threatening woman "because the police are connected to the

gangs." This reference, found only in her background section and not directly connected with any argument, does not prevent Rodriguez-Zuniga from forfeiting the argument that the agency incorrectly found she would not suffer torture with the consent or acquiescence of the government. *See Johnson v. Baker*, 23 F.4th 1209, 1216 n.3 (9th Cir. 2022) (considering "abandoned" assertions made only in the background section of a brief).

The dissent does not agree that Rodriguez-Zuniga forfeited the argument, but it also does not contend that Rodriguez-Zuniga ever mentioned government acquiescence, per se. Instead, the dissent notes, quoting her briefing, that Rodriguez-Zuniga asserted that she had "articulated a specific individualized threat of torture." The dissent extrapolates from this that she must have been *implicitly* arguing that the government would acquiesce in her torture if she returned, because acquiescence is a part of the definition of torture. But that just substitutes one problem for another: even if she meant to implicitly argue that the government would acquiesce, she must still "specifically and distinctly" raise an argument and support it with citations to the record to raise it on appeal. *Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1213 (9th Cir. 2017); *accord Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994); *see also United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived."). Even assuming there was no need for Rodriguez-Zuniga to use the term "acquiescence" or one of its cognates to raise the issue, she still failed to "specifically and distinctly" raise the argument. *See Hayes*, 849 F.3d at 1213.

Because a petitioner can state a claim for CAT relief only if she shows that the government would acquiesce in her torture, Rodriguez-Zuniga's failure to contest this point is fatal to her claim. *See, e.g.*, *Madrigal v. Holder*, 716 F.3d 499, 508 (9th Cir. 2013).[5]  We therefore deny Rodriguez-Zuniga's petition for review of her CAT claim.

### c.   The Dissent's Remaining Concerns Lack Merit.

The dissent vigorously disagrees with the foregoing analysis—in what seems to be practically every regard.  But before we respond to those disagreements one-by-one and explain why they lack merit, it is worth taking a step back to consider the uncontested facts of this case.  This is a case about an attempted robbery of a woman and her son who, upon leaving a bank, were threatened with violence if they didn't hand over some money.  That's it.  Relying on that unfortunate event, plus the regrettably unenviable conditions prevalent in Guatemala, Rodriguez-Zuniga seeks immigration relief that Congress made available for refugees who, if they are returned to their home country, face a particularized risk of persecution because of their status, or else face a greater-than-50% risk of being tortured.  An oft-recognized corollary is that such relief is not available to those who have simply had the misfortune of becoming a victim of criminal misconduct abroad, motivated by the sorts of things (money, generally) that motivate criminals.  *See, e.g.*, *Zetino*, 622 F.3d at 1016.  Immigration law can be complicated, especially because courts have manufactured a byzantine and ever-increasing maze of procedural and substantive standards that are difficult for everyone—

---

[5] Even if she had argued this point, we would still deny her petition because substantial evidence supports the agency's denial of her CAT claim.

asylum-seekers, immigration officials, and courts alike—to navigate. And much of the discussion that follows relates to such arcane requirements. But something has gone terribly wrong when judges conclude that relief for persecution and torture is mandated just because someone was the victim of a brief and failed robbery attempt in their home country. Is that really what anyone thinks Congress meant by providing relief for refugees?

### i. The dissent's concerns regarding our nexus holding are unwarranted.

The dissent offers several criticisms regarding both our explanation of this circuit's precedent on nexus determinations and how we apply that precedent in the above analysis. None of these concerns are warranted.

First, the dissent criticizes our statement that the "record does not compel finding that the persecutor threatened the target because of a protected characteristic such as family relation" when "the record indicates that the persecutor's actual motivation for threatening a person is to extort money from a third person." The dissent finds it difficult to identify who the "target" is. But the dissent's demand that we precisely define whether the "target" is Rodriguez-Zuniga or her son contradicts its later assertion that we must treat Rodriguez-Zuniga and her son as one undifferentiated claim. In any event, any ambiguity that might persist in the identity of the "target" is because we assume that the threat could count as a harm to either person, and then decide whether there was a nexus between that harm and a protected characteristic. The dissent's assertion that we must differentiate between mother and son thus lacks merit.

Second, the dissent argues that the record compels the conclusion that family membership was both "a reason" and

"a central reason" petitioner was targeted for attempted robbery. The dissent strangely claims that we have, "in effect," concluded that the family membership of Rodriguez-Zuniga's son is a but-for cause of the robber threatening the son. That is the opposite of what we're saying—which is that there is zero evidence the robber targeted the son based on the son's family membership per se. The but-for cause of the robber targeting the son is not family membership, it is that the robber thought Rodriguez-Zuniga cared about her son.

To illustrate with an example, imagine the robber attempted to rob a woman who was accompanied, not by her son, but by a pet dog. This dog sports an ornately bejeweled collar and leash and its fur indicates frequent grooming, so the robber can infer the woman cares deeply for her pet. In an attempt to rob the woman, the robber might understandably threaten the dog. No one would think that such a threat was motivated by any animus toward the animal. It would instead be obvious that that the but-for cause of the robber threatening the dog was the robber's belief that the woman cared about the dog and would give the robber money if the dog was threatened. So too here: the but-for cause of the robber threatening the son is not his family membership but because the robber thought, probably correctly, that Rodriguez-Zuniga cared for her son.

Under the dissent's view, every kidnapping where a kidnapper demands money from the *family* of the kidnapped individual would necessarily establish a nexus. If that's what Congress had wanted, it would have made family membership an enumerated category—instead, family membership is sometimes, but not always, a particularized social group. *See Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015) (explaining that "family membership *may*

constitute membership in a 'particular social group'"
(emphasis added)).[6]

Third, the dissent argues that the nexus inquiry is not
about "whether the persecutors' acts were motivated by an
unprotected characteristic." The dissent tries to ground this
innovation in the Supreme Court's decision in *Elias-
Zacharias*, 502 U.S. at 478. In that case, the purported
persecution was a guerilla military organization attempting
to conscript the petitioner into its forces. The Court
explained that even if the persecutors were motivated
politically to conscript people because they wanted to fill
their ranks and "carry on their war against the government,"
that was "irrelevant." *Id.* at 481–82. That is, a nexus could
not be established by a motive "irrelevant" to whether the
persecutor harmed a victim because of a victim's protected
characteristic. *See id.* Instead of relying on *Elias-Zacharias*,
the dissent's argument that the persecutor's financial
motivation is irrelevant ignores the plain import of the
decision. The obvious takeaway is that if, like here, a
persecutor is motivated *exclusively* by a consideration
"irrelevant" to a victim's protected ground, that motivation
is emphatically "relevant"—indeed, that motivation is

---

[6] The dissent faults us for noting that family membership is not
necessarily a particularized social group. But it's unclear where the
dissent derives its belief that a petitioner need not show a family is
"defined with particularity" and "socially distinct within the society in
question." *Rios*, 807 F.3d at 1127 (describing the BIA's "rubric" for
establishing a particular social group). Our caselaw establishes that
family membership "*may* constitute membership in a 'particular social
group,'" not that families are automatically a particular social group. *Id.*
at 1128 (emphasis added) (quotation omitted); *see Gonsalez Padilla v.
Barr*, 830 F. App'x 182, 184 n.2 (9th Cir. 2020) (noting that precedent
"recognize[s] that 'family' could be the basis of a particular social group
and it [is] error to not even consider it" (citing *Rios*, 807 F.3d at 1128)).

decisive—for nexus. A persecutor that is exclusively motivated by something unrelated to a victim's protected characteristic is, tautologically, not motivated by the victim's protected characteristic. Thus here, where substantial evidence supports the agency's finding that the actual motivation of the persecutors was "exclusively" financial, not any protected characteristic, that exclusive financial motivation cannot establish a nexus.

Finally, in criticizing the panel's nexus conclusion, the dissent appears to argue that because the IJ found Rodriguez-Zuniga credible it was obligated to also credit as true her speculation about her persecutor's motives for targeting her. This argument flows from our court's now defunct "deemed-true-or-credible" rule, where we had required that an IJ find true any testimony found to be credible. *See Garland v. Ming Dai*, 141 S. Ct. 1669, 1676–77 (2021). The Supreme Court squarely rejected this rule in *Ming Dai*. *Id.* at 1677 ("The Ninth Circuit's rule has no proper place in a reviewing court's analysis."). The IJ was thus free to find Rodriguez-Zuniga credible without finding persuasive her subjective *beliefs* about why the robber attempted to extort her.

The dissent similarly contends that Rodriguez-Zuniga did not speculate about her persecutor's motives because she testified the robber stated that the robber targeted her because "her family was here and that [she] had a lot of money that [she] could give them." But that contention simply repackages the dissent's error discussed above: evidence that a persecutor targeted someone is not necessarily evidence of the underlying motivation for doing so. To the extent this is evidence of the robber's motives, it is direct evidence that the persecutor targeted Rodriguez-Zuniga, not because of family membership, but because her

family was in the United States and so they assumed she "had a lot of money that [she] could give them."

### ii.    The dissent fails to show a flaw in the agency's reasoning regarding Rodriguez-Zuniga's political opinion—or lack thereof.

The dissent argues that the agency erred in rejecting Rodriguez-Zuniga's claim that she was persecuted because of her political opinion because the agency failed to offer sufficient reasons for its decision and because the BIA engaged in impermissible factfinding. Both arguments fail.

First, the dissent argues that the BIA abused its discretion by offering only a "single-sentence resolution of the issue" that fails to "explain what factors it has considered or relied upon." *Kalubi v. Ashcroft*, 364 F.3d 1134, 1140 (9th Cir. 2004). It is revealing that the dissent never references the content of Rodriguez-Zuniga's asserted political opinion. Her claimed political opinion is her "refusal to submit to violence by criminal groups/gangs." As far as the record reveals, she never stated this opinion to the gang member or to anyone before the robbery, and the only actions that she argues displayed this opinion was her noncompliance with a gang member's extortion attempt.

Although an agency must give reasons sufficient for us to review, the reasons that the agency must offer are certainly coextensive with the complexity of the analysis required by the issue. *See Marcu v. INS*, 147 F.3d 1078, 1083 (9th Cir. 1998) (denying a petition because the BIA "demonstrate[d] that it heard the claim, considered the evidence, and decided against" the petitioner). And here, given the complete lack of evidence supporting Rodriguez-Zuniga's political opinion claim, it is hardly surprising the agency decided to dispose of it in a sentence. Nor do we

have any difficulty ascertaining why the agency denied the claim.

The dissent complains that we have explained the BIA's resolution of the political opinion claim in too much detail. According to the dissent, we have "expand[ed] on the BIA's … rationale for nearly five pages" and are using ex post rationales to justify the BIA.  But notice what explanation the BIA gave and what explanation we give now: the BIA rejected the claim because "there is no evidence [Rodriguez-Zuniga] ever expressed a political opinion."  We deny the petition for review of that claim because there was no evidence she ever expressed a political opinion.  We have not conjured up an ex post facto rationalization of the BIA's decision; we have reviewed for substantial evidence the reason expressly provided by the BIA.

Second, the dissent contends that the BIA engaged in improper factfinding in rejecting Rodriguez-Zuniga's political claim because the IJ did not express any factual findings regarding the claim.  But observing the absence of evidence is not a factual finding.  If it was, then this court of appeals would frequently be a factfinder—which, of course, it cannot be.[7]  The BIA never found facts, it simply looked at the record and observed the petitioner had provided none.

---

[7] *See, e.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1031 (9th Cir. 2013) (affirming a grant of summary judgment against an equal protection claim "[b]ecause [the plaintiff] adduce[d] no evidence that he was treated differently than any other [comparator]"); *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1229 (9th Cir. 2021) (affirming a grant of summary judgment "because [the plaintiff] has presented no evidence of intentional discrimination"); *Fisher v. City of San Jose*, 558 F.3d 1069, 1085 (9th

## IV.    CONCLUSION

The majority is not unsympathetic to Rodriguez-Zuniga and her son's desire to stay in this country.  But all that she has provided in support of her petition are country condition reports and one failed, non-violent robbery that the agency reasonably concluded was wholly economically motivated (as robberies usually are).  Our legal system understandably places primary authority for immigration policy in Congress and the executive branch.  If we stretched our law to grant the petition here, it would be clear that we have substituted ourselves for the immigration officials.  Because she failed to show a nexus between her past or feared future harms and any protected grounds, we deny Rodriguez-Zuniga's petition for review of her asylum and withholding of removal claims.  And because she forfeited any challenge to the agency's finding that she offered insufficient evidence that the Guatemalan government would acquiesce or consent to her torture, we deny her petition for review of her CAT claim.

**PETITION DENIED.**

---

Cir. 2009) (reversing the district court's grant of the plaintiff's renewed motion for judgment as a matter of law on a 42 U.S.C. § 1983 claim because "there [was] no evidence that the [defendant] had a policy … that was the 'moving force' behind any alleged constitutional violation") (en banc); *Gilbrook v. City of Westminster*, 177 F.3d 839, 868 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) (reversing a Rule 50(a) grant of judgment as a matter of law by concluding, among other things, that there was "*no evidence in the record* suggesting" that a factor weighed in favor of affirmance (emphasis added)); *see also Burley v. Gagacki*, 729 F.3d 610, 620 (6th Cir. 2013) (affirming a grant of summary judgment against a "failure-to-intervene theory…. "[b]ecause no evidence place[d] the state and local defendants inside plaintiffs' home at the appropriate time to witness or respond to any unconstitutional conduct that may have occurred").

GILMAN, Circuit Judge, dissenting:

## INTRODUCTION

This court has repeatedly emphasized that "the family remains the quintessential particular social group." *See Parada v. Sessions*, 902 F.3d 901, 910 (9th Cir. 2018) (quoting *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015)). "That is, an asylum-seeker who has suffered persecution 'on account of th[eir] familial relationship' has suffered persecution by reason of membership in a particular social group.'" *Id.* (alteration in original) (quoting *Rios*, 807 F.3d at 1128).

The majority apparently disagrees with the above legal principle by stating that "family membership is sometimes, but not always, a particularized social group." *See* Majority Op. at 29. It therefore discounts persecution that occurs by reason of the petitioner's family membership if the persecutor's motives also contain a financial dimension. In the majority's view, such a petitioner would have to provide an alternative, "actual" reason for the alleged harm. *See id.* at 18, 29. This places an unjustified burden on those seeking relief based on their family membership by harkening back to the much-maligned (and now vacated) regime of *Matter of L-E-A- II*, 27 I. & N. Dec. 581 (A.G. 2019), which held that, "in the ordinary case, a nuclear family will not, without more," qualify as a particular social group. *See id.* at 589, *vacated by Matter of L-E-A- III*, 28 I. & N. Dec. 304 (A.G. 2021).

Congress passed a statute in 1952—the Immigration and Nationality Act—that (1) offers a discretionary pathway to relief for those who reasonably fear persecution on account of their membership in a particular social group, *see* 8 U.S.C.

§ 1158(b), and (2) outright prohibits the removal of noncitizens to countries where they face a clear probability of persecution because of the same, *see* 8 U.S.C. § 1231(b)(3). I believe that the majority's holding is inconsistent with this statutory scheme and Ninth Circuit precedent.

**A. An inherent contradiction exists in the majority's treatment of the nexus element with respect to Rodriguez-Zuniga's son Nelson because family membership cannot be both the primary reason for Nelson's persecution and no reason at all**

The majority holds that, "[w]here the record indicates that the persecutor's actual motivation for threatening a person is to extort money from a third person, the record does not compel finding that the persecutor threatened the target because of a protected characteristic such as family relation." Majority Op. at 18. This proposition is ambiguous—intentionally so, the majority acknowledges, *see id.* at 26-27—because it does not make clear whether the "target" is the direct target of the extortion (Rodriguez-Zuniga and others similarly situated) or the indirect target of the threat (Nelson and others similarly situated). In other words, the majority's holding forecloses not only Rodriguez-Zuniga's ability to satisfy the nexus requirement, but Nelson's as well.

On the one hand, the majority states that "the robber targeted [Nelson] for the same reason she would target, say, [Rodriguez-Zuniga's] life-long friend if the opportunity arose—*merely because she thought Rodriguez-Zuniga cared about that person* and thus the robber could use threats against that person as a means of obtaining money from Rodriguez-Zuniga." *Id.* at 20 (emphasis added). This in

effect makes Nelson's family membership not only a but-for cause, but also the primary cause of his being placed in harm's way.  On the other hand, the majority inexplicably holds that Nelson and those in like circumstances cannot satisfy the nexus requirement.    This is inherently contradictory and unsupported by precedent.

The majority claims that it does not mean to say that Nelson's relationship to his mother is a but-for cause of his threatened harm—this is apparently "the opposite of what [it is saying], *id.* at 29—and yet it then repeats the contradiction by positing that "there is zero evidence the robber targeted the son based on the son's family membership per se.  The but-for-cause of the robber targeting the son is not family membership, it is that *the robber thought Rodriguez-Zuniga cared about her son*."  *Id.* at 29 (emphasis added).  This strikes me as double-talk.

The majority tries once more, this time likening Nelson to Rodriguez-Zuniga's hypothetical pet dog.  If the robber had threatened to harm the dog, the majority suggests, "the but-for cause of the robber threatening the dog was the robber's belief that the woman cared about the dog." *Id.* at 29.  Here again, the majority's error is clear:  the target of the threatened harm is a target *only because of his relationship*—in Nelson's case, his family relationship—to another person.

To satisfy the nexus requirement, an asylum applicant must show that a protected characteristic is "one central reason" for the feared harm.  *Garcia v. Wilkinson*, 988 F.3d 1136, 1144 (9th Cir. 2021).  That "central reason" may be one among many, and "an asylum applicant need not prove which reason was dominant" so long as the protected characteristic is likely to be "a cause of the persecutors'

acts." *Id.* at 1144 (quoting *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009)). For an applicant seeking withholding of removal, an even "weaker motive" will suffice: a protected characteristic need only be "a reason" for the feared harm. *Barajas-Romero v. Lynch*, 846 F.3d 351, 359 (9th Cir. 2017).

Because Nelson's would-be persecutors were interested in him only because of his relationship to his mother, he satisfies both the "a reason" nexus standard for withholding of removal and the "one central reason" nexus standard for asylum. Yet the majority holds that Nelson and others in his position cannot establish that family membership is even "a reason" for any potential persecution where financial gain also motivates the persecutor.

The IJ made the same error in holding that Rodriguez-Zuniga "presented no evidence that her son was threatened on account of his kinship to her," and that the threat to Nelson was instead "motivated exclusively by monetary interest." But the record compels the opposite conclusion: that Nelson was targeted, as the majority puts it, "merely because [the robber] thought Rodriguez-Zuniga cared" about Nelson. Majority Op. at 20. We should therefore reverse the agency's decision for lack of substantial supporting evidence.

I further note that the agency's disposition of Nelson's claim has a direct effect on the agency's disposition of Rodriguez-Zuniga's claim. In *Tchoukhrova v. Gonzales*, 404 F.3d 1181 (9th Cir. 2005), *vacated on other grounds*, 549 U.S. 801 (2006), this court made clear that the threatened harm against Nelson can support Rodriguez-Zuniga's own asylum application:

[W]hen it is only the child who is the direct victim, a narrow interpretation of our asylum laws could have devastating practical effects: Facing imminent removal, parents could be forced to make a choice between abandoning their child in the United States or taking him to a country where it is likely that he will be persecuted.

. . . .

Our precedent supports the pragmatic approach applied here by the agency. When confronting cases involving persecution of multiple family members, we have not formalistically divided the claims between "principal" and "derivative" applicants but instead, without discussion, have simply viewed the family as a whole . . . .

*Id.* at 1191-92.

Thus, should Nelson succeed on his asylum claim, Rodriguez-Zuniga herself may also be afforded relief. As I explain in the next section, however, this court's decision in *Ayala v. Sessions*, 855 F.3d 1012 (9th Cir. 2017), supports the conclusion that Rodriguez-Zuniga independently satisfies the nexus requirement for withholding of removal.

**B.** **The majority's nexus holding with respect to Rodriguez-Zuniga conflicts with this court's decision in *Ayala*, which held that an extortionist's financial motivation does not preclude a nexus finding based on family membership**

In *Ayala*, the petitioner claimed that "she and her husband were the subjects of extortion because of his family's ownership of hotels."  855 F.3d at 1020.  The court held that the IJ erred in concluding that "the only motivation indicated throughout is extortion" despite Ayala's testimony that she was afraid of being targeted on the basis of her marriage to a hotel owner.  *Id.*  The persecutors' financial motivation was insufficient to defeat a nexus finding because Ayala testified that she "faced extortion[] and threats of violence[] not only for economic reasons, but also because of her family ties."  *Id.* at 1021 (citing *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015)).

The majority attempts to distinguish *Ayala*, alleging that Ayala brought "an 'extortion-plus' claim, that is, a claim that the petitioner was independently targeted, not just for money, but also *because of* a protected ground."  Majority Op. at 20-21 (emphasis in original).  But the majority asserts that "common sense tell us that will often, indeed usually, not be the case."  although it "is possible—someone could be motivated to extort a particular person by, say, animus towards their family."  *Id.* at 21.

But nowhere in *Ayala* does the court suggest that a showing of "animus" on the part of the persecutor is necessary and, indeed, Ayala herself made no such showing.  *See Ayala*, 855 F.3d at 1016, 1020-21.  The IJ's error lay in discounting Ayala's testimony that she had been extorted in the past *on the basis of her family membership*, not in

discounting testimony that she had been extorted *on the basis of hatred or animus toward her family*. *See id.* *Ayala* is thus directly on point because we have before us a similar case of "extortion-plus."

Having failed to distinguish *Ayala*, the majority attempts to diminish its weight by claiming that the IJ in that case committed legal error by "categorically holding that, if a persecutor is motivated by a financial goal, *i.e.*, to extort, he cannot also be motivated by a petitioner's protected characteristic." Majority Op. at 21. But contrary to the majority's characterization, the IJ in *Ayala* made no such categorical pronouncement. The *Ayala* court was, in fact, quite clear that the IJ's mistake was akin to that made in this case:

> During the hearing, Ayala claimed that a "group of people" was targeting her because "[m]y husband's family owned hotels and I believe they wanted to extort us and that is why we were being followed." At the end of the hearing, the IJ stated that he was affirming the asylum officer's decision "because the only motivation indicated throughout is extortion, criminal acts." *He did not offer any other explanation.*

*Ayala*, 855 F.3d at 1012 (emphasis added).

In a last-ditch effort to escape *Ayala*'s clear implications, the majority argues that "even the panel in *Ayala* expressed some reservations . . . over whether the petitioner would actually succeed before the agency." Majority Op. at 22. But such reservations are hardly surprising considering Ayala's failure to present the court with factual evidence to

support her theoretically valid nexus theory.  The *Ayala* court summarized the record as follows:

> [Ayala] first entered the United States in 1991 . . . . [S]he remained in the United States until December 1998, when she left with her husband for Guatemala.
>
> Ayala stayed in Guatemala for only one month. Soon after returning to Guatemala, she and her husband were followed by a car while riding their motorcycle. Although Ayala got off the motorcycle at her husband's urging, he continued riding, and the car followed him. Later that day, he was found badly beaten. Her husband then told her to return to the United States with their child. During that same month in Guatemala, Ayala also received threatening phone calls at her house.
>
> Ayala returned to the United States in January 1999 . . . . While she has been in the United States, her family in Guatemala has continued to face threats. In 2007, her husband was murdered, and at some point in 2012, unknown assailants shot at her mother's house.

*Ayala*, 855 F.3d at 1016.  Based on these facts, "Ayala claimed that a 'group of people' was targeting her because '[m]y husband's family owned hotels and I believe they wanted to extort us and that is why we were being followed.'" *Id.* (alteration in original).  On the record before it, the agency might well have found that Ayala had not

provided "*some* evidence . . . , direct or circumstantial" that her persecutors were in fact motivated by her relationship to her husband's family. *See Elias-Zacharias*, 502 U.S. at 483 (emphasis in original).

But in the present case, the record does not require that we simply infer a nexus between persecution and a protected ground. The agency here "accord[ed] . . . full evidentiary weight" to Rodriguez-Zuniga's testimony that the robber warned her "that if she didn't give [the robber] . . . money, [the robber] was going to hurt [her] son," and that she was being targeted because her "family was here and that [she] had a lot of money that [she] could give them." And when Rodriguez-Zuniga refused, the robber said that Rodriguez-Zuniga's "son was going to pay for it."

Rodriguez-Zuniga did not guess at the woman's motives; she instead credibly testified that her would-be persecutor *told her* why she was being targeted. And "there was no testimony or other evidence inconsistent with [Rodriguez-Zuniga's] recounting of her experiences, and there was no reason to doubt the truth, or 'persuasiveness,' of her narrative" concerning the words that were uttered to her by her would-be persecutor. *See Plancarte Sauceda v. Garland*, 23 F.4th 824, 827 (9th Cir. 2022).

Unlike in *Ayala*, then, there is no ambiguity as to why Rodriguez-Zuniga was targeted. Rodriguez-Zuniga's potential persecutors knew her identity and the identities of her family members, and their representative targeted Rodriguez-Zuniga using her relationship to her son and because of her relationship to her husband. Rodriguez-Zuniga has therefore satisfied her burden of establishing that her family membership was at least "a reason" for her persecutors' actions. *See Barajas-Romero v. Lynch*, 846

F.3d 351, 357-58 (9th Cir. 2017) (holding that, to meet the nexus requirement for a withholding-of-removal claim, an applicant need show only that a protected ground is "a reason" for her feared harm).

## C. The nexus standard for family-based particular social groups is not dependent on the persecutor's singular "actual" motivation

In determining whether a nexus exists between persecution and a protected ground, the majority erroneously limits consideration to the persecutor's singular "actual" or "intrinsic" motivation. *See* Majority Op. at 18, 18 n.2. But an asylum seeker need prove only that any prospective persecution "would be 'on account of' one of the five [protected grounds]," or that those protected grounds would be "one central reason" for the harm. *Barajas-Romero*, 846 F.3d at 357-58. In contrast, a person seeking withholding of removal must prove that her "life or freedom will be threatened in [her] home country . . . 'because of' one of the five [protected grounds]," or that those protected grounds would be "a reason" for the harm. *Id.*

Neither asylum claims nor withholding-of-removal claims require that a protected ground be "the persecutor's actual motivation," *see* Majority Op. at 18, for inflicting the harm. Even under asylum's more stringent "at least one central reason" standard, "persecution may be caused by more than one central reason, and an asylum applicant need not prove which reason was dominant." *Parussimova*, 555 F.3d at 741. By eliminating a petitioner's ability to establish a nexus to a protected ground where "the persecutor's actual motivation for threatening a person is to extort money from a third person," *see* Majority Op. at 18, the majority departs from this court's precedents that affirm the principle that

"[p]eople, including persecutors, often have mixed motives." *Garcia v. Wilkinson*, 988 F.3d 1136, 1143 (9th Cir. 2021) (quoting *Barajas-Romero*, 846 F.3d at 357).

The majority states that it does not deny the "basic principle" that "a petitioner may be entitled to relief when a persecutor holds multiple or mixed motivations." *See* Majority Op. at 18 n.2. But the effect of failing to consider alternative motives for persecutory acts when the persecutor also holds a financial motivation (which, in the majority's view, is "the persecutor's actual motivation," *see id.* at 18) *is* to deny that basic principle.

The crux of the majority's rationale seems to be that family membership in a case such as this is not "the actual motivation" for persecution because it is a means to an end. *See id.* at 31-32 But "[a] person may have 'a reason' to do something that is not his 'central' reason or even 'one central reason.'" *Barajas-Romero*, 846 F.3d at 359. And so, to the extent that the majority's holding is directed at Rodriguez-Zuniga and others similarly situated (rather than at Nelson), it is inconsistent with the more lenient nexus requirement for withholding-of-removal claims.

Moreover, a motive is not only "a reason" but also "a 'central reason' if the persecutor would not have harmed the applicant if such motive did not exist." *Parussimova*, 555 F.3d at 741. To satisfy asylum's nexus standard, "an applicant must prove that such ground was a cause of the persecutors' acts." *Id.* And a but-for cause is certainly a cause. *See id.* Thus, for someone like Nelson, who becomes the indirect target of extortionist threats presented to his mother, both nexus standards are satisfied.

The majority's narrow focus on a persecutor's financial motivation is also difficult to reconcile with binding

Supreme Court precedent. In *INS v. Elias-Zacharias*, 502 U.S. 478, 481-82 (1992), the Supreme Court held that whether a persecutor's motives are themselves political is "irrelevant" to establishing a nexus to a protected political opinion. Instead, reviewing courts must ask whether the persecutor is motivated by what they perceive to be the *victim's* protected political opinion. *Id.* at 482.

That same principle applies here. Our inquiry should not be based on whether the persecutors' acts were motivated by an unprotected characteristic, such as a desire for financial gain, but rather on whether they were related to one of Rodriguez-Zuniga's or Nelson's protected grounds—such as family membership. *See id.* ("[T]he ordinary meaning of the phrase 'persecution on account of [a protected ground]' in [8 U.S.C. § 1101](a)(42) is persecution on account of the *victim's* [protected ground], not the persecutor's.") (emphasis in original). That the potential persecutors in the present case also had an economic motivation is thus an insufficient basis for us to dismiss their interest in Rodriguez-Zuniga's and Nelson's family membership, just as the nonpolitical motivations of the persecutors in *Elias-Zacharias* were insufficient to allow the court to dismiss their interest in the petitioner's protected characteristics. *See id.*

## D.  The majority fails to hold the agency accountable for several procedural missteps

### 1.  *The agency failed to independently analyze the likelihood that Rodriguez-Zuniga and Nelson would be subject to future harm*

Both the IJ and the BIA erred in relying on a negative past-persecution finding to reflexively dispose of Rodriguez-Zuniga's and Nelson's future-persecution claim.

The majority outlines the IJ's well-founded-fear finding as follows: "The IJ noted that, having found Rodriguez-Zuniga could not 'claim past persecution on account of a protected ground, it necessarily follow[ed] she also cannot claim a well-founded fear of future persecution on account of the same protected ground.'" *See* Majority Op. at 24 (alteration in original) (quoting the IJ).

No additional analysis was provided by the BIA. Instead, the BIA stated that Rodriguez-Zuniga "did not establish a nexus between the single incident she experienced or the harm she fears and either her family membership, or her status as a Guatemalan woman." *Id.* at 25. And it did so without considering Rodriguez-Zuniga's extensive evidence in support of her well-founded fear of future persecution. The BIA's single sentence is not an analysis; it is a conclusion, and an unsupported one at that.

Settled law clearly provides that the failure to establish a nexus for past harm does not preclude a petitioner from establishing a nexus with respect to likely future harm, even if the claim rests upon the same proffered evidence and protected grounds. *See, e.g.*, *Regalado-Escobar v. Holder*, 717 F.3d 724, 729-30 (9th Cir. 2013) (remanding for the BIA to consider whether a petitioner had established a well-founded fear of future persecution on account of a protected ground, despite affirming the BIA's conclusion that the petitioner had failed to establish a nexus to that same protected ground for past persecution); *Spesovska v. Holder*, 311 F. App'x 946, 948-49 (9th Cir. 2009) (granting the petition for review and remanding "[b]ecause the BIA did not address the question of [the petitioner]'s individualized risk of future persecution based on her religion," notwithstanding its conclusion that substantial evidence

supported the BIA's determination that her past harm had not occurred "on account of" religion).

A contrary interpretation is untenable because the past-persecution and well-founded-fear inquiries are distinct from one another and encompass different factors.  To establish past persecution, a petitioner must provide evidence that "(1) he has endured serious harm such that his 'treatment rises to the level of persecution'; (2) 'the persecution was committed by the government, or by forces that the government was unable or unwilling to control'; and (3) 'the persecution was on account of one or more protected grounds.'" *Singh v. Garland*, 48 F.4th 1059, 1067 (9th Cir. 2022) (quoting *Kaur v. Wilkinson*, 986 F.3d 1216, 1221-22 (9th Cir. 2021)).

By contrast, to demonstrate a well-founded fear of future persecution, a petitioner need not make such a showing.  The petitioner may instead either (1) "establish[] 'a pattern or practice of persecution of people similarly situated,'"  or (2) "prove that she is a member of a 'disfavored group' coupled with a showing that she, in particular, is likely to be targeted as a member of that group." *Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004) (quoting *Knezevic v. Ashcroft*, 367 F.3d 1206, 1213 (9th Cir. 2004), and *Mgoian v. INS*, 184 F.3d 1029, 1035 n.4 (9th Cir. 1999)); *accord, e.g.*, *Halim v. Holder*, 590 F.3d 971, 977 (9th Cir. 2009).  Under the latter approach, "the 'more serious and widespread the threat' to the group in general, 'the less individualized the threat of persecution needs to be.'"  *Sael*, 386 F.3d at 925 (quoting *Mgoian*, 184 F.3d at 1035 n.4).

The distinction between the past-persecution and the well-founded-fear analyses bears directly on the nexus issue.  Suppose an IJ found that an LGBTQ petitioner who faced

removal to a country that criminalizes same-sex relations had faced a single incident of past harm that was not "on account of" her sexual identity or orientation, but rather was an act of random violence.  The law does not allow the IJ to entirely bypass the pattern-or-practice and disfavored-group inquiries by categorically declaring, as she did here, that "because the Court has previously found [that] [the LGBTQ petitioner] cannot claim past persecution on account of a protected ground, it necessarily follows [that] she also cannot claim a well-founded fear of persecution on account of the same protected ground."

Elsewhere in the decision, the IJ acknowledged the evidence that Rodriguez-Zuniga had presented in support of her claim of a well-founded fear of future persecution when the IJ stated that "the record shows that there is a high level of violence against Guatemalan women," including "sexual assault, torture, and mutilation," and recognizing the "very high" levels of "impunity for the perpetrators of such crimes" due to "the government['s] fail[ure] to enforce its laws against rape and domestic abuse."    Yet the IJ inexplicably failed to consider Rodriguez-Zuniga's claim that, "as an alternative to past persecution, [she] satisfies the requirement of well-founded fear of future persecution" on account of her membership in the cognizable social group of "Guatemalan women."

"IJs and the BIA are not free to ignore arguments raised by a petitioner." *Antonio v. Garland*, 58 F.4th 1067, 1075 (9th Cir. 2023) (quoting *Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005)).  And the "[f]ailure to address a social group claim, or failure to analyze such a claim under the correct legal standard, 'constitutes error and requires remand.'"  *See id.* (quoting *Rios v. Lynch*, 807 F.3d 1123, 1126 (9th Cir. 2015)).

Remand is required even if, as the majority suggests, *see* Majority Op. at 22-23, the IJ did not intend to announce a categorical rule, but instead inartfully summarized her implicit findings on nexus with respect to future persecution. "[T]he basis for an agency determination 'must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action.'" *Recinos de Leon v. Gonzales*, 400 F.3d 1185, 1189 (9th Cir. 2005) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)).

### 2. *The agency failed to properly consider Rodriguez-Zuniga's political-opinion claim*

In addition to claiming before the agency that she feared persecution by reason of her family membership and her status as a Guatemalan woman, Rodriguez-Zuniga contended that she was at risk due to her political opinion. Yet the IJ did not address this claim in any way, much less in a meaningful one. And again, "IJs and the BIA are not free to ignore arguments raised by a petitioner." *Antonio v. Garland*, 58 F.4th 1067, 1075 (9th Cir. 2023) (quoting *Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005)).

The majority states that the BIA addressed Rodriguez-Zuniga's political-opinion argument by "concluding that she presented no evidence [that] 'she ever expressed a political opinion.'" Majority Op. at 13 (quoting the BIA). But the BIA abused its discretion in so doing because its single-sentence resolution of the issue—in a footnote, no less—did not satisfy its duty to "explain what factors it has considered or relied upon." *Kalubi v. Ashcroft*, 364 F.3d 1134, 1140 (9th Cir. 2004) (citing *Rodriguez-Matamoros v. INS*, 86 F.3d 158, 160 (9th Cir. 1996)); *see also, e.g.*, *Movsisian v. Ashcroft*, 395 F.3d 1095, 1098 (9th Cir. 2005) ("We have

long held that the BIA abuses its discretion when it fails to provide a reasoned explanation for its actions."); *Mattis v. INS*, 774 F.2d 965, 967 (9th Cir. 1985) ("[W]e require that [the BIA's] stated reasons evidence its consideration of all relevant factors. Cursory, summary or conclusory statements are inadequate." (citations omitted)).

The majority expands on the BIA's single-sentence, footnoted rationale for nearly five pages. *See* Majority Op. at 13-15, 32-33. But "reviewing courts remain bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021).

The BIA's cursory ruling on Rodriguez-Zuniga's political-opinion claim was also erroneous because the BIA arrived at its evidentiary conclusion without the benefit of a factual finding by the IJ. The BIA's regulations are unequivocal: the BIA cannot engage in its own factfinding. 8 C.F.R. § 1003.1(d)(3)(iv)(A) (2022) ("The Board will not engage in factfinding in the course of deciding cases . . . ."). This court, in *Rodriguez v. Holder*, 683 F.3d 1164 (9th Cir. 2012), has said the same:

> Where the IJ has not made a finding of fact on a disputed matter, and such a finding is necessary to resolution of the case, the BIA must remand to the IJ to make the required finding; it may not conduct its own fact-finding. Where the BIA fails to follow its own regulations and makes factual findings, "it commits an error of law, which we have jurisdiction to correct."

*Id.* at 1170 (citations omitted) (quoting *Padmore v. Holder*, 609 F.3d 62, 67 (2d Cir. 2010)); *see also, e.g.*, *Brezilien v. Holder*, 569 F.3d 403, 413 (9th Cir. 2009) ("[W]here the IJ has not made a necessary factual finding, the regulation requires the BIA to remand the factual inquiry to the IJ rather than making its own factual finding on the matter.").

Here, the IJ entirely neglected to consider, even cursorily, that Rodriguez-Zuniga had asserted a political opinion as a protected ground. The BIA thus had no lawful basis to reach a conclusion on this issue. *See Solorio Mejia v. Barr*, 833 F. App'x 455, 457 n.2 (9th Cir. 2020) ("The Board lacked authority to correct the IJ's failure to make a factual determination about whether the cartel imputed a political opinion to Solorio Mejia."). And the defect is not curable by the majority conducting independent factfinding of its own or by offering rationales that were not put forth by the BIA itself. The case should therefore be remanded.

### 3. The agency erred in its analysis of Rodriguez-Zuniga's request for protection under the Convention Against Torture (CAT)

Finally, the agency erred in its analysis of Rodriguez-Zuniga's request for protection under the CAT. The majority avoids this issue by opining that Rodriguez-Zuniga has waived any argument regarding this claim because she "does not argue that the agency erred in finding that she presented insufficient evidence that the Guatemalan government would consent to her torture." Majority Op. at 25.

To the contrary, Rodriguez-Zuniga argues that the agency erred in failing to consider evidence favorable to her CAT claim, and that she has "articulated a specific individualized threat of torture." Government acquiescence

is part and parcel of the legal meaning of torture, which is defined under the CAT not just as an act imposing severe pain or suffering, but rather

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1); *see also, e.g.*, *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1059 (9th Cir. 2006) ("To qualify for protection under CAT, Ornelas-Chavez must establish that he suffered torture, i.e., severe pain or suffering intentionally inflicted for discriminatory purposes "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."); *Hernandez v. Barr*, 830 F. App'x 804, 807 (9th Cir. 2020) (Hunsaker, J., dissenting) ("[T]he definition of 'torture' encompasses government 'acquiescence' . . . ."). By challenging the agency's finding that she was not more likely than not to be tortured, Rodriguez-Zuniga therefore necessarily challenges the agency's findings both as to the severity of the harm that she was likely to suffer and as to acquiescence by the Guatemalan government.

Once the obstacle of waiver is removed, the agency's analytical errors are readily apparent. As a threshold matter, this court has held that "a CAT applicant may satisfy his burden with evidence of country conditions alone." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010). The IJ's guiding principle that "a pattern of human rights

violations alone is insufficient to show a particular applicant would be in danger of torture if returned to that country" is therefore contrary to the law of this circuit.

The agency also erred in failing to consider "all evidence relevant to the possibility of future torture." *See* 8 C.F.R. § 1208.16(c)(3). Specifically, it did not discuss, in analyzing Rodriguez-Zuniga's CAT claim, the evidence that Rodriguez-Zuniga had presented with the respect to the danger that she was likely to face as a woman in Guatemala. The agency's failure to discuss that evidence suggests that the agency ignored its own regulation:

> When nothing in the record or the BIA's decision indicates a failure to consider all the evidence, a "general statement that [the agency] considered all the evidence before [it]" may be sufficient. But, where there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand. Such indications include misstating the record and *failing to mention highly probative or potentially dispositive evidence*.

*Cole v. Holder*, 659 F.3d 762, 771-72 (9th Cir. 2011) (brackets in original) (emphasis added) (quoting *Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006)).

Moreover, "in assessing a CAT claim from an applicant who has posited multiple theories for why he might be tortured, the relevant inquiry is whether the *total* probability that the applicant will be tortured—considering all potential sources of and reasons for torture—exceeds 50 percent." *Velasquez-Samayoa v. Garland*, 49 F.4th 1149, 1154 (9th

Cir. 2022) (emphasis in original).  The agency was thus required to consider not only the country-conditions evidence, but also to consider it in conjunction with evidence of the prior threats against Rodriguez-Zuniga and her son.

Finally, "the IJ and BIA erred by construing 'government acquiescence' too narrowly."  *See Aguilar-Ramos*, 594 F.3d at 705.  The IJ based her acquiescence conclusion solely on "the Guatemalan government['s having] taken steps to combat criminal violence and combat human rights," and that "[t]he Guatemalan constitution and laws also prohibit torture or cruel, inhuman, and degrading treatment."  But this court has found error where "the BIA focused only on the national government's efforts and not their efficacy."  *See Barajas-Romero v. Lynch*, 846 F.3d 351, 363 (9th Cir. 2017).  "[T]he 'efficacy of the government's efforts to stop the . . . violence,' not just the willingness of the national government to do so, must be examined."  *Id.* (quoting *Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013)).

Indeed, in the same opinion where the IJ lauded the Guatemalan government's efforts, she also observed that "[i]mpunity for the perpetrators of . . . crimes against women remain[s] very high, and the government is failing to enforce its laws against rape and domestic abuse," and that "[t]he record details often brutal violence against women by gangs, *government authorities*, and society in general." (emphasis added).  A State Department report concerning human rights in Guatemala remarked that "[p]rincipal human rights abuses included widespread institutional corruption, particularly in the police and judicial sectors; police and military involvement in serious crimes, such as kidnapping, drug trafficking, trafficking in persons, and extortion; and societal violence, including lethal violence against women."

The report further noted that "[g]angs, organized crime, and narcotics trafficking organizations committed considerable violence; corruption and inadequate investigation made prosecution of such crimes difficult."

The agency therefore erred in its consideration of government acquiescence by limiting its analysis to the formalized existence of governmental efforts to protect its citizens.  Whatever the merits of her CAT claim, Rodriguez-Zuniga is entitled to a procedurally adequate adjudication.

## CONCLUSION

The majority hesitates to apply what it characterizes as the "arcane requirements" of our settled law because it is concerned that doing so might lead to results that are not "what . . . Congress meant by providing relief for refugees." Majority Op. at 28.  But our duty is to apply the law, not to rewrite it.

In any event, the majority's fear that "[s]omething has gone terribly wrong when judges conclude that relief for persecution and torture is mandated just because someone was the victim of a brief and failed robbery attempt in their home country," Majority Op. at 28, is unfounded.  To apply this court's precedent would not require the BIA to afford relief to Rodriguez-Zuniga and Nelson.  Instead, "[w]hen we remand due to the BIA's legal error, we allow the BIA to exercise its judgment and administrative expertise using the appropriate legal standards.  In such cases . . . we do not instruct the BIA as to any required outcome on remand." *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994) (citation omitted).

Although I believe that substantial evidence should compel the agency to conclude that Rodriguez-Zuniga and

Nelson have satisfied the nexus requirement, the agency must still determine whether they are likely to suffer future harm rising to the level of persecution.  It must also consider whether the Guatemalan government would be unable or unwilling to protect them from such persecution, and whether they would be able to reasonably relocate within Guatemala.  They thus have many hurdles yet to clear, but in my view they have cleared enough to be entitled to reconsideration.  I therefore respectfully dissent.